IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

WILLIAM SIZER, SAMUEL
MCCORMICK and SHAWNA DAVIS,

        Plaintiffs,

                                   3:10-cv-00553-PK

                                   OPINION AND ORDER

v.

NEW ENGLAND LIFE INSURANCE
COMPANY, a corporation,
METROPOLITAN LIFE INSURANCE CO.,
a Delaware corporation, andMICHELLE
WARNES, an individual,

        Defendants.

_____

PAPAK, Judge:

        Plaintiffs William Sizer, Shawna Davis, and Samuel McCormick filed this action in state

court against New England Life Insurance Company ("New England"), Metropolitan Life

Insurance Co. ("Metlife"), New England's parent company, and Michelle Warnes, managing

partner of New England's local branch office, arising out of their recruitment to become

independent contractor insurance agents with New England.  Sizer and Davis have reported

settling their claims with defendants, leaving only McCormick's claims in dispute.  (#70.)

McCormick alleges claims for breach of contract and fraud relating to defendants' alleged failure

to promote him as promised to a Specialist position and for intentional interference with economic relations relating to Warnes' role in preventing him from being rehired at MetLife. Now before the court are defendants' joint motions for partial summary judgment on McCormick's fraud and intentional interference claims (#48), and defendants' motion in limine concerning damages on McCormick's breach of contract claim (#58). For the reasons described below defendants' motion for partial summary judgment is granted in part and denied in part and defendants' motion in limine is granted.

## BACKGROUND[1]

In June 2008, Michelle Warnes, the managing partner of New England's local branch, became aware of McCormick through a recruiter. (D.'s Mot., #48, Warnes Dep., at 144-145). Over the course of a number of meetings, Warnes offered him a position with New England as an insurance agent. (Warnes Dep., at 145.) During their first meeting, on June 13, 2008, Warnes and McCormick talked about the life insurance Specialist position, although Warnes told McCormick that New England did not usually hire an agent as a Specialist until after spending

---

[1] The following recitation constitutes my construal of the evidentiary record in light of the legal standard governing motions for summary judgment under Federal Civil Procedure Rule 56. That is, in construing the record I view the evidence and all factual inferences drawn from the underlying facts in the light most favorable to the non-moving party, for purposes of the motion now before the court only. *See, e.g., T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Asso.*, 809 F.2d 626, 630-631 (9th Cir. 1987) ("[A]t summary judgment, the judge must view the evidence in the light most favorable to the nonmoving party: if direct evidence produced by the moving party conflicts with direct evidence produced by the nonmoving party, the judge must assume the truth of the evidence set forth by the nonmoving party with respect to that fact. ... Inferences must also be drawn in the light most favorable to the nonmoving party. Inferences may be drawn from underlying facts that are not in dispute, such as background or contextual facts, ... and from underlying facts on which there is conflicting direct evidence but which the judge must assume may be resolved at trial in favor of the nonmoving party.") (citations omitted).

one year with the company.[2] (Warnes Dep., at 146.) A Specialist is a job that requires

collaborating with management to support the firm's business in a particular area and assisting

other agents in selling particular types of insurance. (D.'s Motion, #48, Ex: 13) (job description).

Although there are several different types of Specialists, McCormick was interested in the

"Advanced Sales Specialist" position. *Id.* During their first meeting and subsequent meetings in

June 2008, Warnes told McCormick he was "ideal" for that role based on his previous experience

with high net-worth individuals and indicated that McCormick was "kind of locked up" for the

position. (McCormick Dep., at 120, 136.) McCormick perceived he and Warnes had reached an

agreement on the Specialist position. (McCormick Dep., at 108.)    Based on conversations with

Warnes, McCormick believed the Specialist position was to start in January 2009 and would

come with a $1,500 per month supplemental salary and an 8% bonus on increased life insurance

commissions. *Id.* at 127-128.

　　　In a letter dated July 3, 2008, Warnes offered McCormick a position as an "agent" with

New England, but made no mention of the Specialist position. (D.'s Motion, #48, Ex. 11.)

When McCormick brought up the fact that the offer letter did not mention the Specialist position,

Warnes told McCormick that "it would be all taken care of . . . in six months" and urged him to

trust her. (McCormick Dep., at 108.)    On July 14, 2008, after McCormick had already left his

prior position and was in the New England office working on due diligence reports, Warnes

again presented a copy of the offer letter not mentioning the Specialist position. *Id.* at 114.

McCormick was very upset and insisted on having something in writing assuring him that he

---

[2] Warnes testified that it was her own "policy" at New England not to hire an agent as a
Specialist unless he had been at the agency a year, although she was not sure whether New
England itself had such a policy. (Warnes Dep., at 217.)

would receive the Specialist position, before signing on with New England. (108-109, 114, 121.)
In response, Warnes brought McCormick a copy of the job description for the Specialist position
and handwrote on the top of the front page "* to review with Sam January '09 Advanced Market
Specialist." (McCormick Dep., at 119); (D.'s Motion, #48, Ex. 13.) Warnes also signed and
dated the page. *Id.* McCormick was still not satisfied because the note said "review" and asked
Warnes what would guarantee him the Specialist position. *Id.* at 120. Warnes responded: "At
this time, right here, if you win the agent of the year award," indicating that the position was not
guaranteed otherwise.[3] *Id.* During that meeting on July 14, McCormick reluctantly agreed to
sign the offer letter. *Id.* at 119.

    Several writings described the at-will nature of McCormick's employment.
McCormick's offer letter stated that he would be an at-will employee. (D.'s Motion, #48, Ex. 11)
("This letter is not a guarantee that you will be employed for any particular length of time.
Employment with New England Financial is at-will and can be terminated by either you or the
Company with or without cause."). McCormick's job application, signed on June 18, 2008, also
described his position as that of an at-will independent contractor. (D.'s Motion, #58, Ex. 6.)
Finally, McCormick's GDC agent contract, signed on June 25, 2008, provided that both
McCormick and Warnes reserved the right to terminate the contract "at any time at will and
without cause upon giving thirty (30) days' notice in writing." (D.'s Motion, #58, Ex. 7)
(¶26(b)).

    Despite these references to at-will employment, McCormick testified that Warnes
promised if he earned the Specialist position in January 2009, he would be guaranteed that

---

[3] Warnes disputes that she ever made this statement.

position for all of 2009, and would be reviewed annually thereafter to determine whether he would keep the position. (McCormick Dep., at 143-144.)  McCormick also believed that his GDC agent contract stated his agent appointment would last a year as well, although he testified that such contracts in the industry typically last for at least two years. *Id* at 144, 147.  Finally, McCormick assumed, based on his experience in the industry and the general industry practice, that he would not be terminated so long as he met New England's minimum production requirements, did not have compliance problems, made money for his company, and got along with his coworkers. *Id.* at 146, 163.

In late November and early December 2008, McCormick was under considerable stress, with his wife giving birth to their first baby and his sister dying within a period of a few days. (D.'s Motion, #48, Ex. 200); (McCormick Dep., at 213-214.)   In addition, McCormick was competing to be the top producer for the year. (McCormick Dep., at 202.)   Over the next several weeks, McCormick had several strained interactions with various New England and MetLife staff, the details of which are disputed.[4]

On December 12, 2008,  McCormick confronted Rhoda Laws, a clerk in the New England office, for not overnighting a check to a client as he requested. (McCormick Decl., ¶3); (McCormick Dep., at 59.)  McCormick was "very assertive" when talking to Laws, speaking firmly without yelling, and eventually resorted to having assistant manager Jon Lawry  explain the urgency of the situation to Laws. (McCormick Dep., at 60, 200-201.)  Laws complained about McCormick to Warnes that same day and later sent an email to Warnes describing how McCormick raised his voice and got angry at her. (Warnes Dep., at 180); (D.'s Motion, #48, Ex.

---

[4] I relate these events resolving all factual disputes in favor of McCormick.

Page 5 - OPINION AND ORDER

201.)

Around December 19, 2008, McCormick clashed with Mary Torello, an underwriter at MetLife, who refused to approve a very large life insurance policy for a male client who had a mass in his chest until she received results from a mammogram required by the client's doctor. (McCormick Dep., at 205-208.)  McCormick thought Torello's instance on seeing mammogram results for a man was "ridiculous." (McCormick Dep., at 211.)  McCormick emailed Torello complaining that she "completely wasted . . . my time" and "[blew] this very important case;" McCormick insisted Torello provide "no more worthless answers" and accused Torello of messing up his new newborn baby's Christmas.  (D.'s Motion, #48, Ex. 20, at 4-5.)  Torello's manager complained to Warnes about McCormick, but Warnes did not reprimand McCormick and instead upgraded him to a higher level of underwriter service.  (D.'s Motion, #48, Ex. 202) (McCormick Dep., at 203.)  Around the same time, Warnes and assistant manager Lawry indicated that McCormick looked angry in the office, often snarling, glaring, or sighing loudly in frustration, which made them concerned that McCormick would take his anger "to the next level." (Warnes Decl., ¶¶6-7); (Lawry Dep., at 21, 58, 59-63.)

Sometime in the first several weeks of December– it is unclear exactly whether before or after McCormick's incident with Laws– Warnes told McCormick that she intended to review him for the Specialist position a year after he joined New England, not in January 2009 as she originally stated.  (McCormick Dep., at 165-167.)

Throughout this period of McCormick's strained interactions, Warnes never raised any concerns about McCormick's behavior with him directly.  (Warnes Dep., at 195.)  Warnes also never told McCormick he needed to be more sensitive to co-workers. (McCormick Dep., at 214-

215.)  On December 23, 2008, she sent McCormick an email using a friendly tone saying she was

happy to have him as part of her team in 2009.  (P.'s Resp., #54, Ex. 311.)  Several times in

December, however, Warnes states that she called Patti McClung, the MetLife HR contact

assigned to support New England, reporting her concerns about feeling threatened by

McCormick.[5]  (Warnes Dep., at 194-195.)  Warnes also spoke with McLung between January 1

and January 15 concerning McCormick.  (Warnes Dep., at 203-206.)  There are no notes or

records of any of those conversations between McClung and Warnes, although on January 9,

2009, Warnes forwarded Law's description of her interaction with McCormick to McCLung.

(P.'s Resp., #54, Ex. 65, 310.)

    In early January 2009, just before the 2009 kick-off meeting and awards banquet for

2008, as McCormick passed by Warnes' office, Warnes told McCormick that the Specialist

position was "not going to work out" and apologized.[6]  (McCormick Dep., at 164.)  This made

McCormick very angry and he walked away from Warnes' office without saying anything else.[7]

*Id.*  McCormick testified that he attended part of the 2009 kick-off meeting, on January 12,

---

    [5] New England is a wholly owned subsidiary of MetLife and is controlled by MetLife
executives.  (McCormick Dep., at 227); (Foxen Decl., ¶5.)  MetLife employees provide human
resources, legal and other corporate services to New England.  (McClung Dep., at 86.)

    [6] Warnes now states that she decided not to appoint McCormick as a Specialist because of
his recently surfaced anger issues and his failure to do much joint work with other agents to help
them increase their sales.  (Warnes Decl., ¶7.)  Warnes testified that she felt threatened by
McCormick and shared that fear with Lawry at the time.  (Warnes Dep., at 194); (Lawry Dep., at
55, 63.)

    [7] Warnes claims that McCormick slammed the door after storming out of her office.

Page 7 - OPINION AND ORDER

2009, but walked out because he was very upset over not getting the Specialist position.[8]
(McCormick Dep., at 171.)  McCormick skipped the awards banquet later that evening.  *Id.* at
179.  Around this time McCormick had met with MetLife managers Rick Cederberg and Leonard
Quiroz about the possibility of transferring from New England to MetLife.  (Cederberg Decl.,
¶3); (McCormick Dep, at 242-245.)

On January 14, 2009, McCormick sent Warnes an agitated email requesting his year-end
sales totals and agent ranking, complaining that Warnes was keeping the rankings secret.[9]  (D.'s
Motion, #48, Ex. 21.)  Minutes later, Warnes emailed McClung that she would like to terminate
McCormick.  *Id.*  Later that day, McCormick notified Warnes that he would be seeking a transfer
to MetLife because of Warnes' misrepresentations about the Specialist position and her
patronizing attitude towards him.  (D.'s Motion, #48, Ex. 22.)  The next day, on January 15,
2009, Warnes spoke with McClung and David Warren, MetLife in-house counsel, concerning
potentially terminating McCormick.  (Warnes Dep., at 228-229.)  Warnes reiterated her concerns
about McCormick during that call, including his interactions with Laws and Torello.  (McClug
Dep., at 48-49.)  That same day, on January 15, 2009, Warnes sent McCormick a letter notifying
him that he was immediately suspended and would be terminated in 30 days, but containing no
explanation for his termination.  (D.'s Motion, #48, Ex. 23.)

Over the next week, Warnes communicated with MetLife compliance analyst Doris Cole
to determine whether MetLife would designate McCormick ineligible for rehire.  (D.'s Motion,

---

[8] Warnes reported that McCormick paced in the back of the room, huffing and puffing,
and eventually stormed out, slamming the door behind him.

[9] McCormick had, in fact, achieved the top agent designation for 2008.  (McCormick
Dep., at 170.)

#48, Ex. 203); (Warnes Decl., ¶18). MetLife policy requires that any time a company within the MetLife enterprise, like New England, terminates an agent, a form must be filled out designating whether the agent is eligible for rehire, irrespective of whether the agent has applied for a job elsewhere in the company. (Cole Decl., ¶3.) On January 21, 2009, McLung recommended to Warnes that McCormick be deemed ineligible for rehire and on January 23, 2009, Cole confirmed that she and MetLife counsel Warren had recommended that designation. (D.'s Motion, #48, Exs. 203, 204). Apparently, this decision was made by an upper level HR manager, Nam Patel, based on "comments shared" by McLung and Warren. (P.'s Resp., #54, Ex. 29.) On January 28, 2009, Warnes had her assistant fax the form designating McCormick as ineligible for rehire to MetLife. (D.'s Motion, #48, Ex. 205.)

Even after learning that Warnes had terminated McCormick, MetLife manager Cederberg remained interested in rehiring McCormick. (Cederberg Decl., ¶9.) On January 29, 2009, Cederberg started the process of trying to rehire McCormick, following MetLife's procedures for rehires, one of which requires MetLife to seek information from the applicant's former managers concerning the applicant's performance history and the reasons for separation. (Cederberg Decl., ¶12) (D.'s Motion, #48, Ex. 56.) The same day, Cederberg's supervisor Robin Lewis-Oglesby called Warnes and learned "about his behavior." (D.'s Motion, #48, Ex. 208.) In a short conversation, Warnes told Lewis-Ogelsby that she and McCormick had communication issues and that McCormick exhibited unprofessional behavior to underwriters and staff, but did not mention any specific names or incidents. (Warnes Dep., at 251-253.) Warnes responded to Lewis-Oglesby's questions about why McCormick was terminated because Lewis-Oglesby was "part of our company" and also considered to be Warnes' superior in the corporate hierarchy.

(Warnes Dep., at 288.)

On January 30, 2009, Cederberg described the timing of McCormick's termination as "suspect at best" and initiated a dialogue with Patel urging her to designate McCormick as eligible for rehire. (D.'s Motion, #48, Ex. 207.) Patel told Cederberg that she had spoken with McClung and Warren briefly and learned that they had "concerns" about McCormick, but Cederberg pushed back, stating that Warnes "had a history of trying to harm good people." *Id.* The next day, February 1, 2009, Cederberg wrote Patel and Lewis-Oglesby a long email detailing a prior experience where Warnes tried to "ruin the career" of another representative who requested a transfer. (P.'s Resp., #54, Ex. 29.) In response, Patel acknowledged that she previously declined to allow McCormick to be rehired, but wanted to "discuss and revisit" the issue in light of Cederberg's perspective. *Id.* To that end, Patel convened a conference call on February 2, 2009, with Cederberg, McClung, and Warren. (Cederberg Decl., ¶14.)

During the call, McClung and Warren conveyed their impression of McCormick, gleaned from interviews with Warnes and others. They said McCormick had an "explosive anger problem, that he disrespected people in the office, that many of the people in the office were afraid of [sic] their safety." (Cederberg Dep., at 59.) They also assured Cederberg that Warnes decision to terminate McCormick was not in retaliation for his announcing his intention to leave, but declined to share more details because of the confidential nature of the termination. *Id.* at 59, 62. Patel told Cederberg that McCormick would not fit into the culture of Cederberg's office. *Id.* at 63. The three "strongly advised" Cederberg against rehiring McCormick and Cederberg trusted their recommendation. *Id.* Based on what he heard in the conference call, Cederberg decided not to pursue rehiring McCormick. (Cederberg Decl., ¶16); (D.'s Motion, #48, Ex. 30.)

Page 10 - OPINION AND ORDER

## LEGAL STANDARDS

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is not proper if material factual issues exist for trial. *See, e.g., Celotex Corp. v. Catrett,* 477 U.S. 318, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *Warren v. City of Carlsbad,* 58 F.3d 439, 441 (9th Cir. 1995), *cert. denied,* 516 U.S. 1171 (1996). In evaluating a motion for summary judgment, the district courts of the United States must draw all reasonable inferences in favor of the nonmoving party, and may neither make credibility determinations nor perform any weighing of the evidence. *See, e.g., Lytle v. Household Mfg., Inc.,* 494 U.S. 545, 554-55 (1990); *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000). The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir.1987). The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party." *Id.* (citation omitted).

## DISCUSSION

### I.    Motions for Partial Summary Judgment

Based on defendants' alleged failure to promote him to the Specialist position, McCormick asserts claims for breach of contract and fraud. McCormick also alleges a tortious interference with business relationship claim based on defendants' alleged interference with his attempt to apply for a position at MetLife after he was terminated by New England. Defendants move for summary judgment only against McCormick's fraud and tortious interference claims.

### 1.    Fraud

Defendants argue that McCormick cannot establish *scienter*, a necessary element of

common law fraud, because there is no evidence that Warnes intended to deceive McCormick

when she allegedly promised to promote him to Specialist.  To the contrary, defendants argue

that Warnes changed her mind about promoting McCormick only after he exhibited a volatile

temper in late 2008.   By contrast, McCormick contends that the court can infer Warnes' initial

deceptive intent from her evasive behavior and lack of concern with McCormick's erratic

behavior.  Overall, I agree with McCormick that even under the stringent proof standard for

*scienter* in Oregon fraud claims, he establishes a genuine issue of material fact on that element.

The elements of a claim for fraud under Oregon law are: "(1) a representation; (2) its

falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5)

his intent that it should be acted on by the person and in the manner reasonably contemplated; (6)

the hearer's ignorance of its falsity; (7) his reliance on its truth; (8) his right to rely thereon; and

(9) his consequent and proximate injury." *Webb v. Clark*, 274 Or. 387, 391, 546 P.2d 1078

(1976); *Johnsen v. Mel-Ken Motors*, 134 Or. App. 81, 89, 894 P.2d 540 (1995).  A plaintiff must

establish each element of fraud by clear and convincing evidence.  *Riley Hill Gen. Contractor,*

*Inc. v. Tandy Corp.*, 303 Or. 390, 392, 737 P.2d 595, 597 (1987) (en banc).  The court must

apply this standard when evaluating a motion for summary judgment on a fraud claim.  *See*

*Araujo v. Gen. Elec. Info. Servs.*, 82 F. Supp. 2d 1161, 1170 (D. Or. 2000) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

To establish a defendant's fraudulent intent regarding a promise to act in the future, a

plaintiff must do more than show the eventual breach of that promise. *Webb v. Clark*, 274 Or.

387, 393 n. 2, 546 P.2d 1078 (1976) ("Fraud can never be predicated upon a promise to do something in the future unless it is alleged and proven that, at the time of the making of the promise, there was no present intention of performance or, alternatively, that the promise was made with reckless disregard as to whether the promissor could or could not perform."); *Conzelmann v. Nw. Poultry & Dairy Prods. Co.*, 190 Or. 332, 352, 225 P.2d 757(1950) ("A fraudulent intent not to perform a promise may not be inferred as existing at the time the promise is made from the mere fact of nonperformance."). Rather, a plaintiff must show "[o]ther circumstances of a substantial character . . . in addition to nonperformance before such inference of wrongful intent may be drawn." *Conzelmann*, 190 Or. at 352. Because of the plaintiff's burden to present clear and convincing evidence of fraud, "[t]he Courts will not presume fraud when the transaction is equally susceptible to two explanations, one which is consistent with fraudulent intent and the other with good faith and fair dealing." *S. Seattle Auto Auction Inc. v. W. Cas. & Sur. Co.*, 41 Or. App. 707, 714, 598 P.2d 1269 (1979) (citing *Hurford v. Harned*, 6 Or. 362, 365 (1877)). In determining whether the circumstances compel an inference of fraudulent intent, courts consider the "totality" of defendants' conduct. *Id.* at 714.

Here, assuming factual disputes are resolved in McCormick's favor, a reasonable jury could find by clear and convincing evidence that Warnes did not intend to promote McCormick in January 2009 if he became the top producer. That is, although two plausible explanations can be drawn from the facts assumed to be true on this motion, the inference of fraudulent intent is the more plausible, albeit only slightly.

On the one hand, the record plausibly suggests that Warnes used the promise of the Specialist position to appease McCormick initially without actually intending to award

McCormick that position if he became the top producer in 2008. First, Warnes resisted putting anything in writing about the Specialist position, and even when McCormick insisted, she penned an ambiguous phrase on the Specialist job description, suggesting that she would "review" McCormick for the position in 2009. Moreover, both Warnes' note to "review" him in January 2009 and her alleged promise to promote him then if he was the top producer conflict with her general policy of waiting one year before hiring agents to the Specialist position. Finally, Warnes told McCormick that he would have to trust her about the Specialist position, even though she did not condone such informality regarding the other aspects of McCormick's job offer, which were spelled out in his offer letter. All of this arises in the context of Warnes seeking to finalize her recruitment of McCormick, following a series of conversations over several weeks where McCormick resisted officially committing to his position with New England until Warnes promised him a chance to become Specialist.

Additionally, several factors undercut Warnes' proffered explanation for her later decision not to promote McCormick. Warnes did not speak to McCormick directly about his anger or communication issues as they arose in December 2008, did not document any of her calls discussing these issues with McClung, did not initiate any disciplinary action against McCormick, and did not cite his temper as a basis for withdrawing the promised promotion or terminating McCormick. Further, there is no evidence in the record documenting Warnes' concern that McCormick was not mentoring other agents, the other supposed justification for her refusal to promote him.

Finally, Warnes' shifting stances on promoting McCormick provides additional circumstantial evidence of her fraudulent intent. Initially, according to McCormick's account,

Warnes wrote that she would "review" him for the Specialist position in six months, but orally

promised that she would promote him then if he became top producer. Next, Warnes stated that

she would review McCormick for the position in a *year*, not six months.[10] Ultimately, Warnes

refused to consider McCormick for the promotion completely. In conjunction, the above facts

constitute "circumstances of a substantial character" other than Warnes' non-performance

sufficient for a jury to find the presence of *scienter*.

Of course, the record also plausibly supports the inference that Warnes initially intended

to promote McCormick if he became the top producer, but backed away from that promise

because of McCormick's behavior problems. Warnes was in communication with her HR

representative in early January concerning McCormick's conduct. Some others in the office

shared her apprehension about McCormick's outbursts. And before McCormick's incidents in

the office, Warnes did not completely foreclose the possibility of promoting him; only after his

strained interactions with Laws and Torello did Warnes tell McCormick definitively that he

would not receive the promotion. This inference, however, is somewhat less plausible, especially

because of Warnes' shifting explanations, first extending the timeline for McCormick's

promotion, and then denying it altogether.

Moreover, the cases relied upon by defendants not compel a different conclusion. First,

*Araujo Araujo v. Gen. Elec. Info. Servs.*, 82 F. Supp. 2d 1161 (D. Or. 2000) involved a plaintiff

---

[10] Since Warnes made this announcement sometime in early December 2008 and McCormick had his first major clash with office staff on December 12, 2008, the record leaves open the possibility that Warnes started backing away from promoting McCormick *before* the beginning of the erratic conduct she now cites as the basis for her decision not to promote McCormick.

who interviewed for a job and whose future manager allegedly promised that he would be considered for a regional manager position when it became vacant. 82 F.Supp. at 1170-1171. Plaintiff took the job, but his manager did not allow him to compete for the promotion. *Id.* On summary judgment, plaintiff "contended" that he had established *scienter* because his manager knew at the time of his interview that she could not promise plaintiff would be considered for the regional manager position, since selection of that position occurred at the corporate level. *Id.* at 1170. The Court ultimately determined that plaintiff had not shown clear and convincing evidence of *scienter* because plaintiff admitted in deposition that he had no evidence his manager or other individuals knew her representations were false when she made them. *Id.* at 1171. Because it is unclear from the Court's opinion whether plaintiff produced any evidence– as opposed to mere argument– concerning the corporate selection of the regional manager position, *Aruajo* only teaches that plaintiff provides insufficient evidence of *scienter* when he presents no concrete evidence suggesting fraudulent intention at the time of a representation. This is an unsurprising result. *See, e.g., Commc'ns Group, Inc. v. GTE Mobilnet of Or.*, 127 Or. App. 121, 127, 871 P.2d 502 (1994) ("We are unaware of any evidence, and plaintiffs have directed us to none, from which a reasonable trier of fact could conclude that defendants promised to offer plaintiffs a contract, but never intended to perform the promise.")

Second, defendants rely on *Pelletier v. Pelletier*, 29 Or. App. 717, 565 P.2d 388, 390 (1977), a domestic relations matter where the trial court granted ex-wife an order rescinding a contract with her ex-husband purporting to release him from outstanding child support payments, based on the allegation that the release had been obtained fraudulently. *Id.* at 719-720. The ex-

wife testified that she signed the release in reliance upon her ex-husband's promise that he would pay her own debts of $2,000 and buy her an automobile. The Court of Appeals addressed the ex-husband's argument that the record did not contain sufficient evidence to establish the husband's fraudulent intent. *Id.* at 720-721. There, the Court observed that the only evidence conceivably giving rise to an inference of fraudulent intent was ex-husband's testimony that he was not capable of performing his promise at the time he made the promise. *Id.* at 721. The Court concluded, without further explanation, that "[t]aken alone that testimony is not sufficient to satisfy wife's burden of establishing the requisite mental element by 'clear and convincing' evidence." *Id.* Defendants speculate that the Court recognized the husband may well have intended to fulfill his promise by earning sufficient funds at a later date. Here, however, the issue is not whether defendant had sufficient *ability* to make good on her promise when it was made or even at a later time, as it was in *Pelletier*. Rather, plaintiff seems to admit that even though Warnes could have promoted him as promised, the evidence suggested that she never intended to do so. Moreover, in *Pelletier*, the husband's testimony concerning his financial situation at the time of the promise was the only evidence from which to infer fraudulent intent; here, there is much more circumstantial evidence of Warnes' behavior around the time she made the promise and when she broke it. Thus, I find *Pelletier* does not resolve the crucial issue in this case– what quantum of circumstantial evidence is necessary to conclude that a reasonable jury could infer defendant never intended to carry out a promise from the outset, despite having the capacity to do so.

Plaintiff relies on *Elizaga v. Kaiser Found. Hosps., Inc.*, 259 Or. 542, 487 P.2d 870,

(1971) (en banc), a case which is more applicable to the present situation. There, the trial court held the defendant hospital liable for fraudulently inducing the plaintiff, a surgeon in the Philippines, to come to work for it by promising him a preceptorship that would permit him to become licensed in America. *Id.* at 544. In reliance on that promise, plaintiff moved his family to Oregon from the Philippines. *Id.* At the time it offered plaintiff the position, the hospital knew, or had reason to know, that the Board of Medical Examiners would probably not allow it to continue the preceptorship program, since the Board had granted a final extension to the program after declaring the program was to be terminated. *Id.* at 576. Indeed, the Board failed to reauthorize the preceptorship and the hospital rescinded plaintiff's job offer. *Id.* The Court of Appeals noted that defendant failed to disclose to plaintiff that the preceptorship program would probably end before plaintiff was due to begin work and persisted in that non-disclosure even after learning that plaintiff planned to come to Portland early in reliance on the job offer. *Id.* at 548. The Court held that a jury could decide that the hospital's misrepresentation produced by the non-disclosure was done "in reckless disregard of the fact plaintiff was being misled." *Id.*

Plaintiff implies that this case and *Elizaga* are analogous because, in both, defendant failed to disclose that a necessary pre-condition for plaintiff obtaining the desired position would not occur. There, the hospital failed to reveal that the state Board would not renew the preceptorship program, and here, Warnes did not disclose that McCormick would not have been with New England long enough in January 2009 to be eligible for the Specialist position according to her policy. Defendant seeks to diminish the import of Warnes' policy, suggesting that it was, at best, a non-binding guideline that did not restrict her ability to promote an agent

earlier, if circumstances warranted. However, the degree to which Warnes' own policy limited
her freedom to make certain employment decisions is an unresolved factual issue and I therefore
agree with plaintiff that the Court's reasoning in *Elizaga* is persuasive. For the purposes of this
motion, Warnes' failure to tell McCormick of her personal policy not to promote agents to
Specialist unless they had worked a year could allow a reasonable jury to conclude that Warnes'
made her promise to McCormick in reckless disregard of the fact that he was being misled. *See
Elizaga*, 259 Or. at 548.

Admittedly, the present facts fall a bit short of those in some other Oregon cases not cited
by the parties where courts found the existence of evidence from which a jury could have
inferred defendant never intended to keep a promise, despite having the capacity to do so. *See
Donald H. Hartvig, Inc. v. Clackamas Town Ctr. Assocs.*, 101 Or. App. 79, 84–85, 789 P.2d 679
(1990) (sufficient evidence of fraudulent intent existed when jury could have found that
defendant shopping mall owner told children's store owner the mall's leasing plan called for only
one children's store in the mall to induce him to sign a lease, despite knowing the plan was
flexible and the mall management actually intended for there to be more than one children's
store); *Hocks v. Hocks*, 95 Or. App. 40, 44–45, 767 P.2d 1369 (1989) (sufficient evidence of
fraudulent intent existed where father frequently promised son an interest in the family business
if son worked at a low salary and repeated that sentiment to others, yet simultaneously executed
two wills to the contrary, because father's unqualified assurances to son were knowingly false
and made to keep the son working for him). Nevertheless, these cases have the same flavor as
the present situation, involving a promise that is exaggerated to induce reliance and undercut by

other unfavorable but undisclosed facts. Finally, the fact that Warnes stood to gain from her arguably fraudulent representation by securing McCormick's employment and his best efforts as an insurance salesman in 2008 also bolster the strength of the evidence of fraudulent intent here. *Cf. Commc'ns Group, Inc. v. GTE Mobilnet of Or.*, 127 Or. App. 121, 127, 871 P.2d 502 (1994) (observing that plaintiff's inability to show how defendants would benefit from fraud is "noteworthy" in determining whether a jury could find fraudulent intent.) Accordingly, summary judgment on McCormick's fraud claim is denied.

### B.   Intentional Interference

By contrast, defendants' summary judgment motion on McCormick's intentional interference[11] claim is well -taken because McCormick cannot establish the element requiring defendants to be a third party to the prospective employment relationship between McCormick and MetLife.

To prevail on a claim of intentional interference with economic relations, a plaintiff must establish: 1) the existence of a valid prospective or existing contract or business relationship; 2) intentional interference with that relationship; 3) by a third party; 4) accomplished through improper means or for an improper purpose; 5) a causal effect between the interference and the harm to the relationship or contract; and 6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995) (en banc) (citations omitted).   It is axiomatic that a plaintiff cannot establish the third element if the alleged interferer is itself a party to the prospective relationship.

---

[11] Oregon courts often refer to this claim as "intentional interference with economic relations," but the parties describe it as tortious interference with a business relationship.  I use the formulation frequently adopted by Oregon courts.

*McGanty*, 321 Or. at 537 ("in addressing the third-party element of the tort, this court has stated the general principle that a party to a contract cannot be liable for interference with that contract."). Indeed, "[t]he tort [of intentional interference with economic relations] serves as a means of protecting contracting parties against interference in their contracts from *outside* parties." *Id.* at 536 (emphasis in original); *see also Wampler v. Palmerton*, 250 Or. 65, 77, 439 P.2d 601 (1968) ("the interest protected by [this tort] is the interest of the plaintiff in not having his [economic relationship] interfered with by *intermeddling strangers*") (emphasis added).

Here, plaintiff essentially concedes that summary judgment on this claim should be granted as to both MetLife and Warnes. Plaintiff admits that MetLife was the other party in McCormick's prospective employment relationship. Moreover, plaintiff admits that Warnes acted only within the scope of her employment with New England and therefore, as a matter of law, she is not an independent entity from New England. *See McGanty*, 321 at 538. Thus, the only remaining question for the court to resolve is whether New England, a wholly owned subsidiary of MetLife, is a "third party" to the prospective economic relationship between McCormick and MetLife.

Whether a parent corporation and its wholly owned subsidiary can be third parties capable of interfering in each others' economic relationships is an open question of Oregon law. *See Mentor Graphics Corp. v. Akar Armagan Ahnet*, No. 98-811-AS, 1999 U.S. Dist. LEXIS 6051 (D. Or. Mar. 9, 1999). In *Banaitis*, the most recent Oregon case on the subject, plaintiff was a vice president of BanCal, a company acquired by MBL, a Japanese financial institution. *Banaitis v. Mitsubishi Bank, Ltd.*, 129 Or. App. 371, 373, 879 P.2d 1288 (1994). MBL acquired

13 percent of BanCal stock directly and also acquired a holding company that held the rest of

BanCal's stock. *Id.* After an MBL employee who was sent to manage BanCal falsely accused

plaintiff of misconduct and accelerated his voluntary departure from the company, depriving him

of pension benefits, plaintiff brought a claim for intentional interference with business relations

against MBL. *Id.* at 374-375. The trial court denied defendants motion for a directed verdict on

the claim and the jury found for plaintiff. *Id.* at 375. MBL appealed, arguing that because it

owned BanCal, it was effectively a party to the employment contract between plaintiff and

BanCal and therefore could not be liable for intentional interference between plaintiff and itself.

*Id.* at 382. MBL apparently relied upon a disavowed and tersely reasoned Georgia district court

case, *Morast v. Lance*, 631 F.Supp. 474 (N.D. Ga 1986), holding that a bank could not be

considered a third party when it allegedly interfered in the employment of the president of the

bank's wholly owned subsidiary, since the subsidiary was alleged to be directly controlled by the

bank's board of directors. *Id.* at 383. The Oregon Court of Appeals expressly declined to decide

whether to adopt the rule from the Georgia decision because it was inapplicable in *Banaitis*,

where the evidence did not establish as a matter of law that MBL directly controlled BanCal. *Id.*

The Court observed that MBL owned only 13 percent of BanCal stock and there was no

conclusive evidence on whether MBL controlled BanCal through its holding company; indeed,

MBL and BanCal testified that MBL did not control BanCal either directly or indirectly.

In *Mentor Graphics*, Judge Askmanskas recognized the lack of dispositive Oregon law on

this issue and observed that other state courts were split on the topic, ultimately avoiding

articulating a governing rule by addressing the issue on procedural grounds. 1999 U.S. Dist.

LEXIS 6051, at *8-9. There, Mentor Graphics and it's Singapore subsidiary brought a suit for a

declaratory judgment that the defendant, their employee, had been lawfully terminated. Plaintiffs

later moved to dismiss defendant's counterclaim of intentional interference with economic

relations. Without adopting a rule from any of the conflicting authority in various states, the

Court simply noted that the relationship between Mentor and its subsidiary "has yet to be fully

developed to determine how closely [Mentor and its subsidiary] are interconnected and whether

they share common economic interests," and denied their motion to dismiss. *Id.*

     Given the lack of decisive Oregon case law, I make a reasonable determination about how

the Oregon Supreme Court would resolve this issue. *See Aetna Casualty &Surety Co. v. Sheft*,

989 F.2d 1105, 1108 (9th Cir. 1992). I am persuaded by defendants' very thorough analysis,

(D.'s Motion, #48, at 28-34), positing that the Oregon Supreme Court would also endorse a fact-

specific analysis and characterize a wholly owned subsidiary as a party – rather than a third

party– to the economic relationships of its parent company so long as the parent actually

controlled the activities of the subsidiary such that they acted as a single enterprise. This

approach is consistent with *Banaitis* and *Mentor Graphics*, each of which elevated the practical

analysis of control over a formalistic analysis of ownership. *See Banaitis*, 129 Or.App. at 383

("Ownership of stock, by itself, is insufficient to establish actual control of a corporation.")

     Here, plaintiff presents insufficient evidence to create a genuine question of fact

concerning whether New England was independent from MetLife. Although the two are separate

legal entities organized under the laws of different states, all other evidence suggests MetLife

completely controlled New England in addition to owning it formally. In handling McCormick's

termination, Warnes sought assistance from MetLife-employed HR and legal staff. Warnes followed MetLife policies in determining whether to designate McCormick as eligible for rehire and deferred to a MetLife HR manager's designation. When McCormick sought a position with MetLife, both MetLife managers and Warnes treated McCormick as an internal re-hire, following appropriate MetLife policies specific to such situations. Warnes answered questions about McCormick's performance and termination posed by a MetLife manager as required under those policies and because she perceived the MetLife manager to be her corporate superior. At the broader corporate level, Warnes' manager was a vice president of sales who oversaw several MetLife and New England agencies, and the top manager of New England's sales force reported to a MetLife executive. (Foxen Decl., ¶¶2-5.) Moreover, in late 2009, MetLife closed the New England agency in Portland formerly managed by Warnes and merged its remaining agents and staff into the MetLife agency managed by Cederberg. *Id.* at ¶6. This overwhelming, uncontradicted evidence demonstrates that New England and MetLife are part of the same enterprise and that New England, as a matter of law, cannot be a third party to McCormick's prospective employment relationship with MetLife. On this basis alone, summary judgment must be granted for defendants.

Moreover, even if New England was a third party to the prospective relationship, plaintiff's claim would still fail because Warnes (acting on behalf of New England) did not directly interfere with McCormick's rehire effort. Instead, all her communications regarding McCormick, except for her required phone conversation with MetLife manager Lewis-Oglesby, occurred in the context of her efforts to have McCormick terminated, not to prevent his rehire.

Plaintiff argues that Warnes intentionally interfered because MetLife HR and legal staff used the knowledge they gained from her in assisting with McCormick's termination to recommend against his rehire. That argument simply demonstrates that the weakness of the nexus between Warnes' alleged improper means and her interference. *See Douglas Med. Ctr., LLC v. Mercy Med. Ctr.*, 203 Or. App. 619, 636, 125 P.3d 1281 (2006) (requiring "a direct connection between the 'interference' and the 'improper means.'"). In the course of a proper termination, Warnes provided MetLife with evidence about McCormick that MetLife later used, on its own accord, to recommend against McCormick's rehire. Defendants' motion for summary judgment on McCormick's intentional interference with economic relations claim is therefore denied.

## II.    Motion in Limine

Defendants also move for an in limine ruling capping potential damages on McCormick's breach of contract claim. Specifically, defendants ask the court to rule that even assuming defendants breached Warnes' promise to promote McCormick to the Specialist position, McCormick's employment relationship with New England was strictly at-will, and therefore, his potential damages are limited to the Specialist salary he would have received up to the date of his termination as a New England agent, but not beyond, amounting to $2,250.

McCormick does not now dispute that his insurance agent position was initially at-will. Indeed, all the documents he signed– his application, GDC contract, and offer letter– clearly indicate the at-will nature of his position. Plaintiff's arguments to overcome that at-will status pertain to the Specialist position, and Warnes' promise regarding that position alone. I start from the assumption that unless McCormick had an employment contract for the Specialist position

specifying a fixed term, it is presumed to be terminable at-will. *See, e.g., Campbell v. Ford Indus., Inc.*, 274 Or. 243, 249, 546 P.2d 141(1976).

Defendants first argue Warnes never promised McCormick the Specialist position for a fixed term. At most, defendants say, Warnes promised McCormick that the Specialist position would be reviewed annually, which creates only a contingent right to yearly reviews without disturbing the at-will nature of the employment relationship. McCormick concurs that Warnes never explicitly offered him guaranteed employment as a Specialist for at least a year. He argues, however, that such a guarantee must result as a matter of law because Warnes' statement that McCormick would be reviewed annually after achieving the Specialist position was tantamount to a guarantee that the position would last at least one year and would be terminated thereafter only for just cause. I disagree.

Under Oregon law, an employment contract promising some future action only confers a contingent right to that benefit without disturbing the at-will nature of the employment relationship. *See Porter v. OBA, Inc.*, 180 Or. App. 207, 212, 42 P.3d 931, 934 (2002) (rejecting argument that employment contract providing for vesting of stock options at 18 months of employment provided employee a fixed term of employment for 18 months, since even if evidence extrinsic to the contract was considered, none indicated any negotiations for a fixed term); *State ex rel. Roberts v. Pub. Fin. Co.*, 294 Or. 713, 718–19, 662 P.2d 330 (1983) (rejecting argument that employee terminated before working one full year was still owed vacation pay which vested on his anniversary, because employer's duty to grant vacation pay only arose if employee remained employed, observing that employee "is attempting to change this at will

Page 26 - OPINION AND ORDER

contract into a one year employment contract.")

Similarly, an employer's reference to long-term employment or regularly recurring

benefits, like payment of annual bonuses, does not transform an at-will employment relationship

into one terminable only for cause. *See Wooton v. Viking Distrib. Co.*, 136 Or. App. 56, 60–61,

899 P.2d 1219 (1995) ("That plaintiff could remain in defendants' employ until retirement was,

like all at-will employment, dependent on whether 'all went well and if everyone was pleased.'

Moreover, the provision by an employer of a retirement plan does not, as plaintiff suggests,

reasonably create the expectation that the employer promises a job to its employee until

retirement. Nor does the provision of annual bonuses, a profit-sharing plan or periodic praise

imply that a long-term contract has been formed. To conclude otherwise would virtually destroy

the at-will employment doctrine or, conversely, force employers to eliminate many valuable

forms of compensation."). Finally, other courts outside of Oregon addressing exactly the issue

raised by McCormick have recognized that an employer's promise of recurring yearly reviews

does not create a contract for employment for a fixed term. *See, e.g., Sharff v. Pioneer Fin.*

*Serv., Inc.*, No. 92 C 20034, 1993 WL 87718, at *7 (N.D. Ill. Mar. 22, 1993) ("A promise of

annual performance review does not transform a contract terminable at will to one promising

long-term employment.").

Plaintiff seems to argue, without supporting authority, that Warnes' assurance of annual

reviews, and her promise of the Specialist position as a whole, is "ambiguous" or "illusory" if it

does not create an entitlement to a fixed term of employment. I disagree. Even accepting as true

that Warnes promised McCormick the Specialist position, to be reviewed annually, the resulting

Page 27 - OPINION AND ORDER

employment contract is not ambiguous, given the overriding presumption that all employment is at-will. Further, the promise is not illusory. Even without a promise of guaranteed employment, plaintiff would have received something of value, namely, the opportunity to earn a higher salary and commissions as a Specialist, so long as he retained that position. Accordingly, I find that Warnes' alleged promise to review McCormick for the Specialist position annually, if he earned the position in January 2009, did not affect the at-will nature of McCormick's employment with New England.

Defendants also argue that, even assuming Warnes orally promised McCormick the Specialist position for a fixed term, she lacked the actual or apparent authority to bind New England with that promise. Defendants note that McCormick's GDC agent contract prohibits change, waiver, or modification of the right to terminate at-will unless such a change is memorialized in writing, signed by the Managing Partner (Warnes) and a Senior Officer of New England, and specifically designated as an amendment to the relevant provision of the GDC agent contract. (D.'s Motion, #58, Ex. 7, at 6) (§26(b)). It is undisputed that there is no such writing attesting that McCormick's agent position was no longer at-will. Moreover, defendants point to McCormick's admission that his allegedly promised Specialist position was supplemental to and inextricably interconnected with his agent position, such that if he was terminated from his agent position, he could not remain in the Specialist position by itself. (McCormick Dep., at 139-140.) Thus, defendants conclude that since McCormick's agent position remained at-will, his Specialist position did as well. Defendants also contend that since other general-purpose employment documents McCormick received explicitly described all

employment at New England as terminable at-will, Warnes' alleged promise of a fixed-term Specialist position cannot abrogate these at-will disclaimers. I find that common law agency principles support defendants' position.

The Oregon Supreme Court has stated: "For a principal to be bound by an agent's action, the principal must take some affirmative step, either to grant the agent authority or to create the appearance of authority. An agent's actions, standing alone and without some action by the principal, cannot create authority to bind the principal." *Taylor v. Ramsay-Gerding Constr. Co.*, 345 Or. 403, 410, 196 P.3d 532 (Or. 2008) (en banc). It is clear, based on the GDC agent contract, that Warnes lacked actual authority to orally modify the at-will status of McCormick's agent position. Similarly, there is no evidence whatsoever that New England affirmatively granted Warnes the power to decouple the Specialist position from the agent position, such that the agent position remained at-will while the Specialist position was for a fixed term of one year. This leaves apparent authority as the only possible basis for Warnes' alleged oral promise to bind New England.

Discussing the role of apparent authority in the employment context, the Ninth Circuit explained that "[u]nder Oregon law, an employer may be held liable for contracts made by its agent, if the employer has by words or conduct led third parties to believe that the agent has authority and the third party actually believes the agent is authorized on the basis of the employer's statements or conduct." *Koepping v. Tri-County Metro. Transp. Dist. of Or.*, 120 F.3d 998, 1003 (9th Cir. 1997) (citing *Filter v. City of Vernonia*, 64 Or.App. 559, 563, 669 P.2d 350 (1983) and *Wiggins v. Barrett & Assoc., Inc.*, 295 Or. 679, 669 P.2d 1132, 1144 (1983)).

Thus, the question here is whether New England's words or conduct led McCormick to actually

believe that Warnes was authorized to orally modify his at-will status employment status in order

to guarantee him the Specialist position for a year. Although the issue of an agent's apparent

authority to bind its principal is a normally a question of fact for the jury, the court may decide it

as a matter of law where only one reasonable conclusion can be drawn from the facts. *See*

*Stanfield v. Laccoarce*, 284 Or. 651, 655, 588 P.2d 1271 (1978).

Here, only one reasonable conclusion can be taken from the facts: Warnes had no

apparent authority to offer McCormick any employment for a fixed term. The record suggests

that New England gave Warnes the actual authority to negotiate with agents, generally set the

terms of their employment, make offers of employment, and the like. Thus, one might be

tempted to presume that by giving Warnes actual authority to make certain hiring decisions, New

England also created apparent authority for Warnes to transform an agent's at-will employment

into employment for a fixed term. *See Taylor*, 345 Or. at 411 ("when a principal clothes an agent

with actual authority to perform certain tasks, the principal might create apparent authority to

perform other, related tasks."). Yet the language of McCormick's GDC agent contract precludes

such an inference. McCormick is assumed to have read his employment contract, which he

signed. That contract unambiguously states that the right to terminate at-will can only be

modified by a writing signed by Warnes and a New England Senior Officer. By including this

requirement into the agent contract, New England took an affirmative step to clarify the limits of

Warnes' authority to change the at-will status of employees.

If the record included *any* evidence whatsoever casting doubt on New England's

commitment to this limitation, I would be more inclined to leave this question to the jury. But I

find none. No New England corporate officer suggested Warnes had this power. Warnes never

represented that she had received approval from New England to give McCormick a fixed-term

position, nor did she imply she would seek such approval in the future. No other agents

purported that Warnes promised to modify their at-will positions in a similar fashion. In sum, the

at-will disclaimer and no-oral-modification clause in McCormick's GDC agent contract

conclusively prevent New England from being bound by Warnes' alleged promise to McCormick

of employment for a fixed term.

I therefore grants defendants' motion in limine seeking a ruling that McCormick's

relationship with New England was at-will and that his breach of contract damages are capped at

$2,500, the Specialist salary McCormick would have received from January 2008 until his

termination on February 14, 2009.

//

//

//

//

//

//

//

//

//

## CONCLUSION

For the reasons stated above, defendants' motions for partial summary judgment on McCormick's fraud and tortious interference claims (#48) is granted as to the intentional interference claim but denied as to the fraud claim, while defendants' motion in limine concerning McCormick's breach of contract damages (#58) is granted.

IT IS SO ORDERED.

Dated this 9th day of May, 2012.

Honorable Paul Papak
United States Magistrate Judge

Page 32 - OPINION AND ORDER